IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 20, 2017

## STATE OF TENNESSEE v. ROBERT LANDON WEBSTER

**Appeal from the Criminal Court for Carter County**
**No. 23390A  Lisa Rice, Judge**

_____

### No. E2016-02127-CCA-R3-CD

_____

A Carter County Criminal Court Jury found the Appellant, Robert Landon Webster, guilty of three counts of selling .5 grams or more of cocaine, one of which was within a school zone.  The trial court sentenced the Appellant to a total effective sentence of fifteen years.  On appeal, the Appellant contends that his right to confrontation was violated because the State failed to call a confidential informant as a witness at trial and that the evidence was not sufficient to sustain his convictions.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Gregory S. Norris, Elizabethton, Tennessee, for the Appellant, Robert Landon Webster.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; Anthony Wade Clark, District Attorney General; and Dennis Brooks, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The Appellant was charged with three counts of selling .5 grams or more of cocaine, one of which was within a school zone, based upon transactions with Phillip Williams who was working as a confidential informant with the Elizabethton Police Department.

At trial, Corporal John Bulla with the Elizabethton Police Department testified as an expert in the field of narcotics investigations. Corporal Bulla said that after he arrested Mr. Williams, Mr. Williams agreed to work as a confidential informant in an attempt to gain consideration from the police and the district attorney general's office. Mr. Williams suggested that he purchase cocaine from the Appellant, and he did so on three occasions.

Corporal Bulla said that the first transaction occurred on March 20, 2015. For weeks, Mr. Williams had been attempting to gain the Appellant's trust, and he told the Appellant that he was "down on his luck" and needed to make money. Immediately prior to the transaction, Corporal Bulla and Drug Enforcement Agency (DEA) Task Force Agent Mike Commons met Mr. Williams at a predetermined location. The officers searched Mr. Williams, his vehicle, and his wife, Ashley Williams, who was accompanying him during the transaction, to ensure they had no contraband or money. Thereafter, Corporal Bulla gave Mr. Williams $240 in cash from the "drug fund" to make the purchase. The officers also equipped Mr. and Mrs. Williams with a device so they could record the transaction as it occurred. Mr. and Mrs. Williams drove to the Appellant's residence, and the officers followed them in a separate vehicle, stopping far enough from the residence to avoid being seen but close enough to monitor the transaction.

Corporal Bulla recalled that Mr. and Mrs. Williams entered the Appellant's residence at 9:22 p.m. As he was monitoring the recording device, Corporal Bulla heard the Appellant explain he was giving Mr. Williams $5 in change because the crack cocaine cost only $235. After the transaction, Mr. and Mrs. Williams left the residence at 9:32 p.m. and met with Corporal Bulla and Agent Commons. The officers again searched Mr. and Mrs. Williams and their vehicle. Mr. Williams gave Corporal Bulla the $5 and a substance that appeared to be crack cocaine. The substance was tested by the Tennessee Bureau of Investigation (TBI), and it was determined to be .57 grams of crack cocaine. Corporal Bulla did not pay Mr. Williams for his work as a confidential informant.

Corporal Bulla said that the next transaction occurred at the residence of the Appellant's mother on March 23, 2015. Corporal Bulla said the residence was located 758.6 feet "straight line distance" from Harold McCormick Elementary School. The Appellant chose the location of the transaction. Prior to the transaction, Corporal Bulla and Agent Commons met with Mr. and Mrs. Williams, searched them and their vehicle, and equipped them with a recording device. Corporal Bulla gave Mr. Williams $250 to make the purchase. Mr. and Mrs. Williams drove their vehicle to the prearranged location, and the officers followed. Mr. and Mrs. Williams arrived at the location at 7:52 p.m. As Corporal Bulla monitored the transaction, he heard Mr. Williams, Mrs. Williams, and the Appellant discussing the weight of the product that was being sold to

Mr. Williams. Corporal Bulla heard the Appellant say "that when he re-ups, meaning when he gets more drugs, that he will sell [Mr. Williams] a ball, which is a determined amount of cocaine for $185." After the transaction, Mr. and Mrs. Williams left the residence at 7:59 p.m. and immediately met Corporal Bulla and Agent Commons. The officers searched them, and Mr. Williams gave Corporal Bulla the substance he had purchased from the Appellant. TBI testing revealed that the substance was .92 grams of crack cocaine.

Corporal Bulla said that the final transaction between Mr. Williams and the Appellant occurred at the Appellant's South Second Street residence on March 28, 2015. Once again, Corporal Bulla and Agent Commons met with Mr. and Mrs. Williams before the transaction, searched them and their vehicle, and equipped them with a recording device. Corporal Bulla gave Mr. Williams $300 to make the purchase. Corporal Bulla and Agent Commons then followed Mr. and Mrs. Williams to the Appellant's residence. The informants arrived at the Appellant's residence at approximately 6:51 p.m. and left at approximately 7:02 p.m. After the transaction, Corporal Bulla and Agent Commons met Mr. and Mrs. Williams. Mr. Williams gave Corporal Bulla the substance he had purchased from the Appellant; the substance was in three separate bags. The officers searched Mr. and Mrs. Williams but found no other contraband. TBI testing revealed that the first bag obtained by Mr. Williams contained .88 grams of crack cocaine; the other two bags contained a total of .72 grams of "rock-like substance," but no analysis was performed on the substance in those bags.

On cross-examination, Corporal Bulla acknowledged that he was not present for the transactions, that he could not see the transactions, and that he only listened as the transactions took place. Corporal Bulla said that both Mr. and Mrs. Williams were working for the police as confidential informants. Corporal Bulla acknowledged that Mr. Williams' "case" was "still in the process but he has received some consideration . . . ."

Corporal Bulla recalled that Mr. and Mrs. Williams drove "a green older model BMW." He thoroughly searched the vehicle for contraband before the transactions but did not dismantle the vehicle to search for any secret compartments. He also searched Mr. and Mrs. Williams prior to the transactions but did not strip search them. Corporal Bulla acknowledged that after each transaction, he weighed the crack cocaine immediately upon receipt from Mr. Williams. The field weights he reported, 2.1 grams, 2 grams, and approximately 3 grams, respectively, were heavier than the weights determined by the TBI. When asked about the discrepancy between the field weights and the weights determined by the TBI, Corporal Bulla explained that he weighed the crack cocaine while it was inside the packaging, that sometimes the packaging was large, and that the TBI crime laboratory weighed only the substance. He further explained that the TBI testing could have occurred after water had evaporated from the crack cocaine, which would contribute to a lesser weight.

- 3 -

Phillip Williams testified that in early 2015, Corporal Bulla arrested him for selling schedule III drugs. After spending a short time in confinement, Mr. Williams "decided to change [his] life." He agreed to work for Corporal Bulla as a confidential informant and was released on bond. Thereafter, Mr. Williams pled guilty to the charge for which he was arrested and received a sentence of two years, which he was serving on "house arrest."

Mr. Williams said that he had sold marijuana and crack cocaine with the Appellant previously and that he told Corporal Bulla he could purchase crack cocaine from the Appellant. After speaking with Corporal Bulla, Mr. Williams contacted the Appellant and told him that Mr. Williams' car had been repossessed and that he did not have a job. He asked the Appellant to sell him some crack cocaine so that he could resell it and make money, and the Appellant agreed. Ultimately, Mr. Williams made three purchases of crack cocaine from the Appellant.

Mr. Williams said that the first transaction occurred at the Appellant's house on March 20, 2015. A recording of the transaction was played for the jury. During the transaction, the Appellant gave Mr. Williams one bag of crack cocaine for $235. Mr. Williams gave the Appellant $240 and received $5 in change. Afterward, Mr. Williams gave the bag of crack cocaine to Corporal Bulla.

The second transaction occurred at the Appellant's mother's house on March 23, 2015. A recording of the transaction was played for the jury. During the transaction, Mr. Williams reminded the Appellant that he had promised to give Mr. Williams 2.5 grams of crack cocaine, but Mr. Williams thought the Appellant gave him only 2 grams. Mr. Williams asked the Appellant about another crack cocaine seller, and the Appellant cautioned Mr. Williams that if he bought crack cocaine elsewhere, he "would end up with a bag of watered-down crack." Mr. Williams recalled that the Appellant had said that he could not sell Mr. Williams an "eight-ball" of crack cocaine for $200 but later said he could get Mr. Williams "an eight-ball for the price of a seven." The Appellant also offered to sell Mr. Williams 3.5 grams of crack cocaine for $185, and Mr. Williams accused the Appellant of charging him "[c]rack head prices." As Mr. Williams was leaving, the Appellant told Mr. Williams to call him the next day because he might be able to get more crack cocaine.

Mr. Williams said that the final transaction occurred at the Appellant's house on March 28, 2015. A recording of the transaction was played for the jury. Mr. Williams stated that before the transaction, Corporal Bulla had given him a set of scales to weigh the drugs. When Mr. Williams attempted to use the scales during the transaction, the Appellant asserted that the weight of the crack cocaine was "on point meaning that it's

- 4 -

right." The Appellant told Mr. Williams that he was going to leave and get more "dope" and that he "could get an eight-ball" for Mr. Williams.

Mr. Williams said that during each transaction, he obtained crack cocaine from the Appellant and that he paid the Appellant "with marked money from the Elizabethton Police Department."

On cross-examination, Mr. Williams acknowledged that he had testified incorrectly on direct examination that Corporal Bulla had arrested him on new charges and that instead, Corporal Bulla had taken him into custody because he had violated probation. Mr. Williams said that Corporal Bulla searched him and Mrs. Williams thoroughly prior to each transaction. Mr. Williams acknowledged that during the March 28 transaction, the Appellant did not mention crack cocaine specifically; he did, however, ask Mrs. Williams why she wanted to purchase marijuana from him if she did not want to smoke it.

After Mr. Williams testified, the State recalled Corporal Bulla. Corporal Bulla stated that the Appellant's references to "water" and "eight-ball[s]" were not consistent with someone who was dealing marijuana; however, the terminology was consistent with someone who was dealing crack cocaine. Corporal Bulla acknowledged that during the second transaction, Mrs. Williams attempted to purchase marijuana from the Appellant. Afterward, she asked Corporal Bulla what she should do if the Appellant offered her marijuana to use during a subsequent transaction. He advised her to tell the Appellant that she could not use marijuana because she was on probation and subject to random drug screens. During the last transaction, the Appellant offered her marijuana, but she refused and gave the explanation suggested by Corporal Bulla.

Corporal Bulla recalled that the Appellant's trial originally was scheduled for February 9, 2016. Corporal Bulla had informed the prosecutor that in early February, Mr. Williams had checked himself into "rehab at Woodridge" and that the State needed to issue a subpoena for his attendance at trial. During a telephone call between the Appellant at the Carter County Jail and his mother, Gladys Glispie, on February 3, 2016, they discussed whether Mr. Williams would "show in order to testify or not." Ms. Glispie told the Appellant that she had measured and determined that her property was 585 feet from the school. The Appellant responded that he was "up sh[*]t's creek." A recording of the call was played for the jury.

The jury found the Appellant guilty of two counts of selling .5 grams or more of cocaine, a Class B felony, and one count of selling .5 grams or more of cocaine within a school zone, a Class A felony. The trial court sentenced the Appellant to concurrent sentences of eight years for the Class B felony convictions and fifteen years for the Class A felony conviction. On appeal, the Appellant contends that his right to confrontation

was violated by the State's failure to call Mrs. Williams as a witness at trial. The Appellant further contends that the evidence was not sufficient to sustain his convictions.

## II. Analysis

### A. Confrontation Clause Violation

On appeal, the Appellant contends that because the State failed to call Mrs. Williams as a witness, he was unable to test her credibility; thus, his right to confrontation was violated. The Appellant specifically challenges two "statements": (1) Mrs. Williams' discussions with the Appellant on the recordings of the transactions regarding the purchase of "weed" and (2) Corporal Bulla's testimony that Mrs. Williams was not in possession of any controlled substances prior to each transaction. The Appellant acknowledges that he did not raise an issue at trial regarding a Confrontation Clause violation. Nevertheless, he contends that we should address his issues as plain error.

Initially, we note Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." See also Tenn. R. Evid. 103(d). We may only consider an issue as plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is necessary to do substantial justice.

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotation marks and citation omitted).

In Tennessee, criminal defendants are entitled to confront witnesses against them under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. The exercise of the right to confront "is controlled by the trial judge," and "the trial court's decision will be upheld absent an abuse of discretion." State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006) (internal quotation marks and citation

- 6 -

omitted).

"Currently, Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), and its progeny are the controlling authority for determining whether the admission of hearsay violates a defendant's rights under the federal confrontation clause, and this Court has applied Crawford to challenges under the Tennessee Constitution, as well." State v. Parker, 350 S.W.3d 883, 898 (Tenn. 2011). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In Crawford, the Supreme Court drew a distinction between the admission of testimonial and nontestimonial hearsay, explaining that the admission of nontestimonial hearsay is exempt from Confrontation Clause scrutiny but that the "Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination" for the admission of testimonial hearsay. 541 U.S. at 68.

We begin our analysis with the "threshold question" of whether the statement is testimonial or nontestimonial. State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008). In Crawford, the Supreme Court did not comprehensively define "'testimonial.'" 541 U.S. at 68. Subsequently, in Davis v. Washington, 547 U.S. 813, 822 (2006), the Supreme Court determined that courts should examine the statement's "primary purpose." Thereafter, the Supreme Court provided the following non-exhaustive list of testimonial statements:

> [1] *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and 3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310 (2009) (internal quotation marks and citation omitted).

In his appellate brief, the Appellant contends that some of Mrs. Williams' statements on the recordings "are in fact testimonial and offered for the truth," but he concedes that some of her statements "may simply be conversational and not offered for the truth of the matter asserted." The only "distinct example of the testimonial evidence"

the Appellant offers is Mrs. Williams' attempt to purchase "weed" from him during the third transaction.

Our review of the recordings reveals that during the second transaction, Mrs. Williams asked the Appellant to "get [her] some green," meaning marijuana. The Appellant responded that he had only a "blunt" and that he was keeping it. During the third transaction, the Appellant offered to let Mrs. Williams "[h]it some of this," presumably meaning to smoke some of his marijuana. Mrs. Williams declined, saying that she was on probation. The Appellant was skeptical and asked why she had wanted to buy "weed" from him. She explained that she had planned to use the marijuana after her drug test.

In order to determine whether the challenged statements violate the Appellant's right to confrontation, we must determine "(a) whether the statements contain assertions; (b) whether the statements are testimonial; and (c) whether the statements are offered for the truth of the matter they assert." Id. Tennessee Rule of Evidence 801(a) defines a statement as "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." The Rules of Evidence do not define the term "assertion," but it "'has the connotation of a forceful or positive declaration.'" State v. Land, 34 S.W.3d 516, 525 (Tenn. Crim. App. 2000) (quoting Webster's Ninth New Collegiate Dictionary 109 (1985 ed.)). This court has stated that "nothing is an assertion unless intended to be one." Id.

When specifically examining statements made by informants, this court has explained that a statement made directly to the police generally reveals information about the accused and is offered to prove the truth of the matter asserted; accordingly, the statement violates a defendant's right to confrontation "because it is both testimonial and hearsay." State v. George Anthony Bell, No. M2008-01187-CCA-R3-CD, 2009 WL 3925370, at *5 (Tenn. Crim. App. at Nashville, Nov. 19, 2009). Conversely, most "informant statements made during a recorded conversation between the informant and a non-law enforcement party do not violate the Confrontation Clause." Id. at *6. This court explained:

> In this situation, the informant generally does not divulge information but rather converses with a third party in order to expose a target's criminal acts to police. As a consequence, the fact of the informant's interaction with a third party rather than the substance of his statements during that interaction is the chief focus of law enforcement and, later, of a criminal trial. In the analogous situation of a recorded conversation at a crime scene between a defendant and a party unaware of the recording, this Court has held the party's statements were

offered to establish context for a defendant's admissible statements instead of the truth of the matter asserted. In summary, statements made during recorded conversations between an informant and a non-law enforcement party generally are admissible because they are not offered for the truth of the matter they assert.

Id. (citations omitted).

As the trial court observed at the motion for new trial hearing, Mrs. Williams was "kind of in the background of things" and "was not necessarily as ardently involved or directly involved in the sale of these substances as was" Mr. Williams. Mrs. Williams never discussed the purchase of cocaine with the Appellant; instead, she asked the Appellant to procure some marijuana for her then later refused to smoke marijuana with him. The State did not offer any of Mrs. Williams' recorded statements for the truth of the matter asserted. Therefore, we conclude that the introduction of the statements did not violate the Appellant's right to confrontation.

Next, the Appellant challenges Corporal Bulla's and Mr. Williams' testimony regarding the search of Mrs. Williams. The Appellant maintains their testimony revealed a "non-verbal assertion" by Mrs. Williams that she "was not in possession of any controlled substances prior to meeting with" the Appellant and complains that he was not afforded the opportunity to cross-examine her regarding her credibility or veracity. However, the Appellant's arguments have misconstrued the Confrontation Clause. Notably, we can discern no conduct on the part of Mrs. Williams that constitutes a "non-verbal assertion." See State v. Sexton, 368 S.W.3d 371, 412 (Tenn. 2012), as corrected (Oct. 10, 2012) (quoting Tenn. R. Evid. 801(a)). Further, both Corporal Bulla and Mr. Williams testified regarding the search and were subject to cross-examination by the Appellant. We conclude that the Appellant's right to confrontation was not violated by Corporal Bulla's and Mr. Williams' testimony. See State v. Jeffrey W. Tittle, No. M2016-02006-CCA-R3-CD, 2017 WL 4773427, at *7 (Tenn. Crim. App. at Nashville, Oct. 23, 2017).

Finally, the Appellant contends that he did not object to the introduction of Mrs. Williams' statements on the recordings due to his expectation that she would testify; therefore, he is entitled to plain error review. He noted that Mrs. Williams' name was on the State's witness list and that the State "referred to [her] and her role in both jury selection and opening statement." He further noted that she "was subpoenaed by the State to appear on behalf of the State, therefore, [the Appellant] did not in turn issue a second subpoena to appear." The Appellant maintains that after the State rested its case-in-chief, he attempted to locate and subpoena Mrs. Williams; however, he was unable to locate her.

We note that the State was not required to call Mrs. Williams as a witness. This court has explained that "[t]he State is not required to call any particular witness in a criminal prosecution, but this does not preclude the accused from compelling a particular witness to be present on his behalf." State v. Osborne, 712 S.W.2d 488, 492 (Tenn. Crim. App. 1986). To that end, the Appellant could have issued a subpoena to secure her testimony. See Tenn. Code Ann. § 40-17-107(a); State v. Womack, 591 S.W.2d 437, 444 (Tenn. Ct. App. 1979). The Appellant acknowledged that he chose not to subpoena Mrs. Williams and thereby accepted the risk that the State would not call her as a witness. See State v. Winfred Lee Faulcon, No. W2001-01153-CCA-R3-CD, 2002 WL 1482661, at *2 (Tenn. Crim. App. at Jackson, Feb. 26, 2002). Therefore, we conclude that the Appellant's attempt to blame the State for Mrs. Williams' absence is disingenuous. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). We conclude that the Appellant is not entitled to plain error relief based upon a Confrontation Clause violation.

## B. Sufficiency of the Evidence

The Appellant argues that the verdict was contrary to the weight of the evidence and that the trial court, acting as thirteenth juror, should have overturned the verdict. See Tenn. R. Crim. P. 33(d). This court has observed that once the trial court has approved the verdict as the thirteenth juror, as it has in this case, our appellate review is then limited to determining the sufficiency of the evidence. See State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993).

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Our criminal code provides that a defendant who knowingly sells .5 grams or more of cocaine, a Schedule II controlled substance, is guilty of a Class B felony. Tenn. Code Ann. § 39-17-417(a)(3), (c)(1). If the transaction occurs within 1,000 feet of the "real property that comprises a public or private elementary school, middle school, secondary school, preschool," the offense "shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation." Tenn. Code Ann. § 39-17-432(b)(1).

In the light most favorable to the State, the proof adduced at trial reveals that on March 20, 23, and 28, 2015, Corporal Bulla and Agent Commons met with Mr. and Mrs. Williams, searched them and their vehicle, and, upon finding no contraband, supplied them with a recording device and cash to purchase drugs from the Appellant. Thereafter, the informants drove their vehicle to a prearranged location and met the Appellant. During the first and third transactions, they met at the Appellant's house. During the second transaction, they met at the Appellant's mother's house, which was within 1,000 feet of an elementary school zone. On each occasion, Mr. Williams gave the Appellant money in exchange for crack cocaine in an amount greater than .5 grams. Following each transaction, the informants immediately met the officers, relinquished the cocaine, returned the recording device, and submitted to another search.

The Appellant contends that Mrs. Williams, "a crucial and necessary witness[,] was not present" for the jury to assess her credibility. However, as we have noted, the State was not required to call Mrs. Williams as a witness. Moreover, during closing argument, the Appellant emphasized Mrs. Williams' absence from trial and posited that she may have possessed the drugs but that the drugs were not found because of an inadequate search by the officers. The jury heard the proof and clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that the State adduced sufficient evidence to sustain the Appellant's conviction.

### III.  Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE